| UNITED STATES DISTRICT COURT | EASTERN DISTRICT OF TEXAS |
|---|---|

| | |
|---|---|
| IN THE MATTER OF THE COMPLAINT § <br> OF GRAHAM OFFSHORE TUGS LLC § <br> AND SEABULK TOWING SERVICES, INC. § <br> AS OWNERS AND OWNERS PRO HAC § <br> VICE OF THE T/V SABINE FOR § <br> EXONERATION FROM OR LIMITATION § <br> OF LIABILITY § <br> § | CIVIL ACTION NO. 1:22-CV-371 |

**MEMORANDUM AND ORDER**

Pending before the court is Graham Offshore Tugs LLC and Seabulk Towing Services, Inc.'s, as owners *pro hac vice* of the *T/V Sabine* ("Seabulk Petitioners"), Motion for Exoneration from Liability/Summary Judgment (#40). Claimant Arthur Wolford ("Wolford") and Claimant KSS Line Ltd. ("KSS Line") both filed responses in opposition (#s 43, 44). Seabulk Petitioners filed replies to the responses in opposition (#s 46, 47). KSS Line filed a sur-reply (#48). After considering the motion, the submissions of the parties, the record, and the applicable law, the court concludes that Seabulk Petitioners' motion should be denied.

I.  Background

This proceeding arises from an allision between the *T/V Sabine* ("SABINE") and the *M/V Gas Ares* ("GAS ARES"). The SABINE is a tugboat owned by the Seabulk Petitioners, and the GAS ARES is a liquefied petroleum gas ("LPG") carrier which was operated by and under the bareboat charter of KSS Line. During the evening of November 25, 2021, the GAS ARES was transiting inbound in the Neches River in a ballast condition bound to load a cargo of LPG at the Sunoco Logistics berth in Nederland, Texas. At the time, the GAS ARES was being conned by a State Licensed Harbor Pilot and was under escort from a single tug, the HAYLEY MORAN.

At all relevant times, the SABINE was moored at the Motiva Dock 1, outside the navigable water way, with its engines turned off.  At the time of the incident, the SABINE was operating with a three-member crew, including Wolford (the captain), an engineer, and a deckhand.[1]  The SABINE was secured with lines side by side to the FLORIDA, another tugboat owned by Seabulk Petitioners.

As the GAS ARES approached the Motiva Terminal in Port Neches, it decreased its speed to avoid disrupting a nearby pipeline removal project.  As it slowed, the wind pushed the GAS ARES toward the Motiva Terminal on the south side of the channel, where Motiva Docks 1 and 2 are located.  At about 10:25 p.m., the GAS ARES narrowly made it past a vessel moored at Motiva Dock 2 and sounded multiple blasts from its whistle.  At this time, Wolford was in his stateroom on the SABINE, without a radio.  Upon hearing the blasts from the GAS ARES's whistle, Wolford headed to the SABINE's wheelhouse, observed the GAS ARES headed toward the SABINE, rang the general alarm, and told his crew to hold on in preparation for impact.  At approximately 10:27 p.m., the GAS ARES allided with the moored SABINE.  The allision caused damage to the SABINE, the FLORIDA, and the Motiva Dock 1.  Wolford claims to have sustained injuries as a result of the allision.

On March 11, 2022, Wolford filed a lawsuit against Seabulk Petitioners styled *Arthur D. Wolford v. Seabulk Towing Services, Inc.*, in the 172nd District Court of Jefferson County, Texas, Cause No. E-0209439.  On July 27, 2022, Wolford filed Plaintiff's Second Amended Petition further naming KSS Line, KSF Global No 4 SA ("KSF"), and BGN International DMCC

---

[1] The standard crew for the SABINE includes four members: a captain, a mate, an engineer, and a deckhand.

("BGN") as additional defendants. Seabulk Petitioners filed a Complaint for Exoneration from or Limitation of Liability ("Complaint") with this court on September 8, 2022. On January 26, 2024, Seabulk Petitioners filed the pending motion for exoneration from liability/summary judgment (#40). Seabulk Petitioners allege that there were no actions taken by them, the SABINE, or Wolford that caused or contributed to this incident, and that the sole cause of the allision were the actions and inactions of the crew of the GAS ARES. Wolford filed his response to the motion on February 16, 2024, asserting that Seabulk Petitioners failed to provide an adequate number of crew members and that Seabulk Petitioners did not have appropriate policies in place concerning being on watch (#43). Also on February 16, 2024, KSS Line filed its response, arguing that Seabulk Petitioners failed to enforce its policies for monitoring radio communications and standing watch, or, in the alternative, that Seabulk Petitioners did not have adequate policies in place (#44). On February 23, 2024, Seabulk Petitioners filed replies to both responses (#s 46, 47), and on March 1, 2024, KSS Line filed a sur-reply (#48).

II.     Analysis

   A.     Summary Judgment Standard

Rule 56(a) of the Federal Rules of Civil Procedure provides that summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *Union Pac. R.R. Co. v. Palestine*, 41 F.4th 696, 703 (5th Cir.), *cert. denied*, 143 S. Ct. 579 (2023); *United Steel, Paper & Forestry, Rubber Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union v. Anderson*, 9 F.4th 328, 331 (5th Cir. 2021); *Smith v. Harris County*, 956 F.3d 311, 316 (5th Cir. 2020); *Parrish v. Premier Directional Drilling, L.P.*, 917 F.3d 369, 378 (5th Cir. 2019); *Hefren v.*

*McDermott, Inc.*, 820 F.3d 767, 771 (5th Cir. 2016). The parties seeking summary judgment bear the initial burden of informing the court of the basis for their motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which they believe demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *MDK Sociedad De Responsabilidad Limitada v. Proplant Inc.*, 25 F.4th 360, 368 (5th Cir. 2022); *Goldring v. United States*, 15 F.4th 639, 644-45 (5th Cir. 2021); *Playa Vista Conroe v. Ins. Co. of the W.*, 989 F.3d 411, 416-17 (5th Cir. 2021); *Jones v. United States*, 936 F.3d 318, 321 (5th Cir. 2019). To warrant judgment in their favor, the movants "must establish beyond peradventure *all* of the essential elements of the claim or defense." *Lyons v. Katy Indep. Sch. Dist.*, 964 F.3d 298, 302 (5th Cir. 2020) (quoting *Dewan v. M-I, L.L.C.*, 858 F.3d 331, 334 (5th Cir. 2017)); *accord Access Mediquip L.L.C. v. UnitedHealthcare Ins. Co.*, 662 F.3d 376, 378 (5th Cir. 2011). "Summary judgment is rarely granted in maritime negligence cases because the issue of whether a defendant acted reasonably is ordinarily a question for the trier of fact." *Luwisch v. Am. Marine Corp.*, No. CV 17-3241, 2018 WL 3031887, at *4 (E.D. La. June 18, 2018) (quoting *Schoenfeldt v. Schoenfeldt*, No. 13-5468, 2014 WL 1910808, at *3 (W.D. Wash. May 13, 2014)).

"A fact issue is 'material' if its resolution could affect the outcome of the action." *Hemphill v. State Farm Mut. Auto. Ins. Co.*, 805 F.3d 535, 538 (5th Cir. 2015) (quoting *Burrell v. Dr. Pepper/Seven Up Bottling Grp., Inc.*, 482 F.3d 408, 411 (5th Cir. 2007)); *see MDK Sociedad De Responsabilidad Limitada*, 25 F.4th at 368; *Lexon Ins. Co., Inc. v. Fed. Deposit Ins. Corp.*, 7 F.4th 315, 321 (5th Cir. 2021); *Dyer v. Houston*, 964 F.3d 374, 379 (5th Cir. 2020). "Factual disputes that are irrelevant or unnecessary will not be counted." *Tiblier v. Dlabal*, 743

F.3d 1004, 1007 (5th Cir. 2014) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)); *accord Valencia v. Davis*, 836 F. App'x 292, 296 (5th Cir. 2020); *see Dyer*, 964 F.3d at 379; *Parrish*, 917 F.3d at 378. "An issue is '*genuine*' if it is real and substantial, as opposed to merely formal, pretended, or a sham." *Gerhart v. Barnes*, 724 F. App'x 316, 321 (5th Cir. 2018) (quoting *Bazan ex rel. Bazan v. Hidalgo County*, 246 F.3d 481, 489 (5th Cir. 2001)); *accord Johnson v. City of San Antonio*, No. 22-50196, 2023 WL 3019686, at *6 n.7 (5th Cir. Apr. 20, 2023); *Nall v. BNSF Ry. Co.*, 917 F.3d 335, 340 (5th Cir. 2019). Thus, a genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Hefren*, 820 F.3d at 771; *accord MDK Sociedad De Responsabilidad Limitada*, 25 F.4th at 368; *Sanchez Oil & Gas Corp. v. Crescent Drilling & Prod., Inc.*, 7 F.4th 301, 309 (5th Cir. 2021); *Dyer*, 964 F.3d at 379; *Tiblier*, 743 F.3d at 1007.

Once a proper motion has been made, the nonmoving parties may not rest upon mere allegations or denials in the pleadings but must present affirmative evidence, setting forth specific facts, to demonstrate the existence of a genuine issue for trial. *Celotex Corp.*, 477 U.S. at 322 n.3; *see Beard v. Banks*, 548 U.S. 521, 529 (2006) (quoting FED. R. CIV. P. 56(e)); *Flowers v. Wal-Mart Inc.*, 79 F.4th 449, 452 (5th Cir. 2023); *MDK Sociedad De Responsabilidad Limitada*, 25 F.4th at 368; *Clark v. CertainTeed Salaried Pension Plan*, 860 F. App'x 337, 340-41 (5th Cir. 2021); *Acadian Diagnostic Lab'ys, L.L.C. v. Quality Toxicology, L.L.C.*, 965 F.3d 404, 410 (5th Cir. 2020). The court "should review the record as a whole." *Black v. Pan Am. Lab'ys, LLC*, 646 F.3d 254, 273 (5th Cir. 2011) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)); *see Hacienda Recs., L.P. v. Ramos*, 718 F. App'x 223, 234 (5th Cir. 2018); *City of Alexandria v. Brown*, 740 F.3d 339, 350 (5th Cir. 2014). All the evidence must be

construed in the light most favorable to the nonmoving party, and the court will not weigh the evidence or evaluate its credibility. *Reeves*, 530 U.S. at 150; *Seigler v. Wal-Mart Stores Tex., L.L.C.*, 30 F.4th 472, 476 (5th Cir. 2022); *Batyukova v. Doege*, 994 F.3d 717, 724 (5th Cir. 2021); *Lyons v. Katy Ind. Sch. Dist.*, 964 F.3d 298, 302 (5th Cir. 2020). The evidence of the nonmovants is to be believed, with all justifiable inferences drawn and all reasonable doubts resolved in their favor. *Tolan v. Cotton*, 572 U.S. 650, 651 (2014) (quoting *Anderson*, 477 U.S. at 255); *Seigler*, 30 F.4th at 476; *Batyukova*, 994 F.3d at 724; *Lyons*, 964 F.3d at 302. The evidence is construed "in favor of the nonmoving party, but only where there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." *Spring St. Partners-IV, L.P. v. Lam*, 730 F.3d 427, 435 (5th Cir. 2013) (quoting *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005)); *accord Lexon Ins. Co., Inc.*, 7 F.4th at 321; *Geovera Specialty Ins. Co. v. Odoms*, 836 F. App'x 197, 200 (5th Cir. 2020) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)).

Furthermore, the court's obligation to draw reasonable inferences "does not extend so far as to allow a wholly 'unreasonable inference' or one which amounts to 'mere speculation and conjecture.'" *Mack v. Newton*, 737 F.2d 1343, 1351 (5th Cir. 1984) (quoting *Bridges v. Groendyke Transp., Inc.*, 553 F.2d 877, 879 (5th Cir. 1977)); *accord McGill v. BP Expl. & Prod., Inc.*, 830 F. App'x 430, 432 (5th Cir. 2020); *Batyukova*, 994 F.3d at 724 ("'Conclusory allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation' will not survive summary judgment." (quoting *Orr v. Copeland*, 844 F.3d 484, 490 (5th Cir. 2016))); *Stearns Airport Equip. Co., Inc. v. FMC Corp.*, 170 F.3d 518, 528 (5th Cir. 1999) ("If the [nonmoving party's] theory is . . . senseless, no reasonable jury could

6

find in its favor, and summary judgment should be granted." (quoting *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 468-69 (1992))); *Mills v. Warner-Lambert Co.*, 581 F. Supp. 2d 772, 779 (E.D. Tex. 2008) ("[O]nly reasonable inferences in favor of the nonmoving party can be drawn from the evidence." (citing *Eastman Kodak Co.*, 504 U.S. at 468 n.14)). "[S]ummary judgment may not be thwarted by conclusional allegations, unsupported assertions, or presentation of only a scintilla of evidence." *Certain Underwriters at Lloyd's, London v. Axon Pressure Prods. Inc.*, 951 F.3d 248, 256 (5th Cir. 2020) (quoting *McFaul v. Valenzuela*, 684 F.3d 564, 571 (5th Cir. 2012)); *accord Allaudin v. Perry's Rests., Ltd.*, 805 F. App'x 297, 299 (5th Cir. 2020); *Acadian Diagnostic Lab'ys, L.L.C.*, 965 F.3d at 410 (quoting *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007)); *see Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990); *Heath v. Elaasar*, 763 F. App'x 351, 354 (5th Cir. 2019).

    B.    <u>Limitation of Liability</u>

To prevail on a claim of negligence under maritime law, the "plaintiff must demonstrate that there was (1) a duty owed by the defendant to the plaintiff, (2) breach of that duty, (3) injury sustained by the plaintiff, and (4) a causal connection between the defendant's conduct and the plaintiff's injury." *Paragon Asset Co., Ltd. v. Am. Steamship Owners Mut. Prot. & Indem. Ass'n, Inc.*, 99 F.4th 736, 741 (5th Cir. 2024) (quoting *GIC Servs., L.L.C. v. Freightplus USA, Inc.*, 866 F.3d 649, 659 (5th Cir. 2017)); *accord In re Great Lakes Dredge & Dock Co. LLC*, 624 F.3d 201, 211 (5th Cir. 2010) (quoting *Canal Barge Co. v. Torco Oil Co.*, 220 F.3d 370, 376 (5th Cir. 2000)). According to Schoenbaum, "[t]he negligence cause of action may be invoked by virtually anyone who suffers injury or loss in an admiralty setting." 1 THOMAS J. SCHOENBAUM, ADMIRALTY AND MARITIME LAW, § 5-4 (6th ed. 2023).

Under the Limitation of Liability Act, 46 U.S.C. §§ 30501 *et seq.*, a shipowner can limit its liability for damages caused by an incident to the value of the vessel at the end of its voyage, plus any pending freight as long as the shipowner had no privity or knowledge of any unseaworthy condition or negligent act that was a proximate cause of the incident. *See SCF Waxler Marine, L.L.C. v. Aris T M/V*, 24 F.4th 458, 472 (5th Cir. 2022); 46 U.S.C. § 30505(a)-(b). "Exoneration is not mentioned in the Limitation Act, but the Supplemental Rules for Certain Admiralty and Maritime Claims states that a complaint seeking limitation may also demand exoneration." *Odeco Oil & Gas Co., Drilling Div. v. Bonnette*, 74 F.3d 671, 675 n.7 (5th Cir. 1996) ("The complaint may demand exoneration from as well as limitation of liability." (citing Supplemental Rules for Certain Admiralty and Maritime Claims F(1))). "Exoneration is contingent upon a finding of no contributory fault." *Tittle v. Aldacosta*, 544 F.2d 752, 755-56 (5th Cir. 1977) ("Under this standard . . . [the ship owner], his vessel and crew must be shown to have been free from fault."); *accord In re Cent. Gulf Lines, Inc.*, 62 F. App'x 557, 2003 WL 1202793, at *10 (5th Cir. 2003) ("A shipowner free from fault will be exonerated.").

"Liability for collisions on the navigable waters is [often] governed by a series of presumptions and burden-shifting principles." *Bordelon Marine, Inc. v. LaShip, LLC*, 703 F. Supp. 3d 766, 772 (E.D. La. 2023) (quoting *Ill. Constructors Corp. v. Logan Transp., Inc.*, 715 F. Supp. 872, 879 (N.D. Ill. 1989)). *THE LOUISIANA* rule and *THE OREGON* rule concern the presumption of fault. Under the rule of *THE LOUISIANA*, when a vessel drifts into an allision with a stationary object, there is a presumption of fault that shifts the burden of production and persuasion to the drifting vessel. *THE LOUISIANA*, 70 U.S. 164 (1865); *accord Combo Mar., Inc. v. U.S. United Bulk Terminal, LLC*, 615 F.3d 599, 604 (5th Cir. 2010); *James v. River*

*Parishes Co.*, 686 F.2d 1129, 1131-32 (5th Cir. 1982). Likewise, under the rule of *THE OREGON*, the presumption of fault is placed on a moving vessel which, under its own power, allides with a stationary object. *THE OREGON*, 158 U.S. 186, 192-93 (1895); *accord Combo Mar.*, 615 F.3d at 604. "[A]lthough the two presumptions apply to different types of vessels—vessels under their own power and drifting vessels—the courts treat them similarly, looking to law on one to inform decisions on the other." *Combo Mar.*, 615 F.3d at 605. The presumptions are evidentiary in nature and "[o]nce evidence is presented . . . presumptions become superfluous because the parties have introduced evidence to dispel the mysteries that gave rise to the presumptions." *Combo Mar.*, 615 F.3d at 605 (quoting *In re Mid-South Towing Co.*, 418 F.3d 526, 531 (5th Cir. 2005)). The presumptions can be rebutted if "[t]he defendant can demonstrate: (1) that the allision was the fault of the stationary object; (2) that the moving vessel acted with reasonable care; or (3) that the allision was an unavoidable accident. . . . Each independent argument, if sustained, is sufficient to defeat liability." *Combo Mar.*, 615 F.3d at 605 (quoting *Fischer v. S/Y NERAIDA*, 508 F.3d 586, 593 (11th Cir. 2007)).

*THE LOUISIANA* and *OREGON* presumptions speak only to the breach element of negligence, and they are not "presumption[s] regarding either the question of causation (either cause in fact or legal cause) or the percentages of fault assigned parties adjudged negligent." *In re Mid-S. Towing Co.*, 418 F.3d at 532. "[U]nder the comparative fault analysis between a vessel and a stationary object, a vessel may minimize its liability by providing evidence that the stationary object contributed to the injury it incurred, however, it will be absolved of liability only if the stationary object is deemed the sole proximate cause of the injury." *City of Chicago v. M/V*

*Morgan*, 375 F.3d 563, 573 (7th Cir. 2004) (citing *Bunge Corp. v. M/V Furness Bridge*, 558 F.2d 790, 802 (5th Cir. 1977)).

    C.    <u>Petitioners' Motion for Exoneration from Liability/Summary Judgment</u>

Seabulk Petitioners seek exoneration from all claims made against them arising from the allision between the GAS ARES and the SABINE. For Seabulk Petitioners' motion to be granted, there must be no genuine dispute of fact as to whether Seabulk Petitioners and the crew of the SABINE were free of fault. Here, THE OREGON presumption of fault applies and the GAS ARES is presumed negligent because the GAS ARES, a moving vessel, allided with the moored and stationary SABINE.

KSS Line and Wolford each make several arguments, but both contend that Seabulk Petitioners bear some responsibility for the accident because the SABINE failed to have a designated crew member actively on watch in the wheelhouse in order to perceive earlier the danger posed by the out-of-control GAS ARES. According to KSS Line and Wolford, with more notice of the impending impact, the SABINE's crew may have had sufficient time to move the vessel out of the path of the GAS ARES, evacuate the vessel, or more effectively brace for impact.

KSS Line and Wolford assert that Seabulk Petitioners did not comply with their own Safety Management System ("SMS")[2] policies governing standing watch. Seabulk Petitioners' policy regarding Maintaining a Proper Watch and Look Out (Seabulk Towing SMS Section 3, Policy D11) states:

---

[2] The SABINE is an inspected vessel that falls under the Coast Guard rules found at C.F.R. Subchapter M (Towing Vessels). 46 C.F.R § 136.100, *et seq*. To comply with the United States Coast Guard regulations, the SABINE operates under an SMS.

10

> MAINTAINING A PROPER WATCH AND LOOK OUT
>
> When the vessel is underway or at anchor, the officer of the watch is to remain in the wheelhouse until properly relieved. A proper look-out is to be maintained at all times by sight, sound and all available means for the prevailing circumstances and conditions.

Further, Seabulk Petitioners' Shoreside Radio Watch Policy (Seabulk Towing SMS Section 2, Policy T4) provides:

> SHORESIDE RADIO WATCH
>
> While standing by at a dock or facility, the person on watch must monitor the channel required by the dock or facility.
>
> In addition the following should be monitored:
> - Monitor channel 16 or 13
> - Monitor the designated VTS frequency for the transited area
> - Monitor the company communications system

Here, Seabulk Petitioners assert that Wolford was "on watch" at the time of the incident, while also being "on rest." The SABINE was staffed with three crew members and, accordingly, limited to 12 hours service under the United States Coast Guard regulations. The crew was on rest at the time of the incident because the SABINE was set to begin a job at some point after midnight. KSS Line contends that Wolford should not have been allowed to be simultaneously "on rest" and "on watch." In his December 29, 2023, expert report, Captain Willard Walter Breathwit ("Breathwit") states that "[a]lthough Seabulk was reduced to a 12 hour service[,] there were three crew on board. In order to remain in compliance with [United States Coast Guard] regulations and [SABINE]'s SMS system[,] Captain Wolford should have managed the crew by putting the two other crew members on opposing watches." Wolford similarly avers that the SABINE was insufficiently staffed and had inadequate policies governing watch standing in place.

11

Seabulk Petitioners further contend that the SABINE's SMS policies identified above did not apply to the SABINE at the time of the incident. Specifically, Seabulk Petitioners aver that the Maintaining a Proper Watch and Look Out Policy did not apply at the time of the incident because the SABINE was not "underway or at anchor," but rather, was moored at the Motiva Dock 1. KSS Line points out that the SABINE was not moored at a permanent dock, but rather, was tied to the FLORIDA and was not directly moored to Motiva's loading berth. KSS Line argues that because of nature of the arrangement, and the fact that the SABINE was preparing for an upcoming job, its position was more analogous to being at anchor.

Seabulk Petitioners further contend the Shoreside Radio Watch Policy did not apply because the SABINE was moored for rest and was not "standing by" at the service of the Motiva facility. Seabulk Petitioners assert that "[s]tanding by at a dock or facility" is when a Seabulk tug is hired by a dock or facility to keep watch and provide assistance as needed. KSS Line presents Breathwit's declaration to challenge Seabulk Petitioners' conclusion that the SABINE was not "standing by" at the time of the incident. Breathwit "reject[s] the contention that 'standing by' exclusively means 'a tug has been hired by a dock or facility to keep watch and provide assistance as needed[.]' This discounts the fact that the crew of the Sabine were waiting for orders that would come at some point after midnight." Breathwit also observes that "nothing in the policy . . . would suggest 'standing by' is limited to cases where a billable hourly rate is charged to the dock/facility," but rather, "[i]n typical tug operations, 'standing by' generally refers to situations where a tug is not actively working on a job." Further, the expert report of Elliott Tulloch ("Tulloch") concludes that Seabulk Petitioners' "SMS requirement for a watch stander was

12

incompletely and inconsistently understood and implemented by the crew and management, presumably due to insufficient training and communication of policies and procedures."

Although KSS Line and Wolford maintain that the policies were applicable and should have been followed at the times relevant to this lawsuit, in the alternative, they assert that if the policies did not apply, then Seabulk Petitioners failed to ensure compliance with the International Convention on Standards of Training, Certification, and Watchkeeping for Seafarers ("STCW"). "[T]he United States is a signatory of the [STCW]. Therefore, . . . violations of the [STCW] may be the basis of liability for a collision where they are rules designed to prevent collision and a party's violation of them is the contributory cause of a collision." *Tokio Marine & Fire Ins. Co. v. M/V Flora*, No. CIV. A. 97–1154, 1999 WL 14000, at *11 (E.D. La. Jan. 11, 1999), *aff'd sub nom. Tokio Marine & Fire Ins. Co. v. FLORA MV*, 235 F.3d 963 (5th Cir. 2001). KSS Line points to Breathwit's declaration in support of its assertions that Seabulk Petitioners did not comply with the STCW, which provides watch keeping requirements while moored in port. In particular, Breathwit notes that the STCW requires that moored vessels comply with the following:

> 90 On any ship safely moored or safely at anchor under normal circumstances in port, the master shall arrange for an appropriate and effective watch to be maintained for the purpose of safety.
>
> 91 Arrangements for keeping a deck watch when the ship is in port shall at all times be adequate to:
>
>> .1 ensure the safety of life, of the ship, the port and the environment, and the safe operation of all machinery related to cargo operation;
>> .2 observe international, national and local rules; and
>> .3 maintain order and the normal routine of the ship.

(#44-1 (citing STCW.6/Circ.1 Annex)). Regulation VIII/2 of the STCW, in part, provides:

> 1   Administration shall direct the attention of companies, masters, chief engineer officers and watchkeeping personnel to the requirements,

>> principles and guidance set out in the STCW Code which shall be observed to ensure that a safe continuous watch or watches appropriate to the prevailing circumstances and conditions are maintained on all seagoing ships at all times.
>
> 2   Administration shall require the master of every ship to ensure the watchkeeping arrangements are adequate for maintaining a safe watch or watches, taking into account the prevailing circumstances and conditions and that, under the master's general direction:
>
> . . .
>
> > .4   an appropriate and effective watch or watches are maintained for the purposes of safety at all times, while the ship is at anchor or moored
> > . . . .

Moreover, Inland Navigation Rule 5 provides: "Every vessel shall at all times maintain a proper look-out by sight and hearing as well as by all available means appropriate in the prevailing circumstances and conditions so as to make a full appraisal of the situation and of the risk of collision." 33 C.F.R. § 83.05.

In response, Seabulk Petitioners assert that "the Supreme Court and [the Court of Appeals for the] Fifth Circuit have held there is no duty to keep a lookout or watchman aboard a vessel while properly moored in a locale customarily used for mooring." In support of this contention, they cite to *Southern Pac. Co. v. Haglund*, 277 U.S. 304, 310 (1928) and *Hutton v. Walter G. Hougland, Inc.*, 321 F.2d 595, 596 (5th Cir. 1963). These cases, however, are distinguishable from the present facts and fall short of establishing that a duty to keep a lookout on a moored vessel never exists.

In *Southern Pac. Co. v. Haglund*, a steam ferryboat, the THOROUGHFARE allided with a steamship, the ENTERPRISE, in the channel of San Antonio Creek, known as the Oakland Estuary. 277 U.S. at 307-08. The ENTERPRISE was without power and was being assisted by

a tugboat—the RELIEF, when it encountered the THOROUGHFARE. *Id*. at 308. Once the vessels were within about 1,000 feet of each other, the RELIEF "had arrested the movement of the ENTERPRISE and was holding her dead in the water, with her stern about 100 feet from the south edge of the channel, leaving an ample opening for the passage of the THOROUGHFARE." *Id*. While attempting to pass the ENTERPRISE, the THOROUGHFARE saw another tug boat—the UNION—and suddenly changed its course and struck the ENTERPRISE. *Id*. at 309. The Court found that the THOROUGHFARE was the sole cause of the accident for proceeding at full speed despite its obstructed view and needlessly changing course. *Id*. at 309-10. The Court noted that the ENTERPRISE's absence of a lookout "did not in any manner contribute to the collision." *Id*. at 310. Here, KSS Line and Wolford contend that, if the crew members of the SABINE had an earlier warning of the potential impact, they could have either moved their vessel out of the path of the GAS ARES or evacuated the SABINE in time to avoid any injuries—neither of these options appears to have been available to the ENTERPRISE which was being transported in the Oakland Estuary without power.

Further, in *Hutton v. Walter G. Hougland, Inc.*, the Fifth Circuit affirmed the district court's finding that the anchored vessel was partially at fault in a collision because it did not have proper lighting. 321 F.2d at 596. In addition, without explanation, the Fifth Circuit stated, "[w]e do not agree with the owners of the [moving vessel] that the owners of [the anchored vessel] owed a further duty to keep a lookout or watchman aboard the anchored vessel under the circumstances here prevailing." *Id*. Notably, the Fifth Circuit did not hold that an anchored vessel never owes a duty to keep a lookout or watchman aboard, but rather that there was no duty under the

15

circumstances existing in that case.[3] Here, KSS Line and Wolford contend that, under the circumstances present in this case, a proper lookout should have been maintained by sight and sound.

KSS Line presents the declaration and expert reports of Beathwit and the expert report of Tulloch to support its contention that the SABINE should have required a member of its crew to maintain a proper watch by keeping lookout in the wheelhouse and by monitoring the radio channels. Breathwit submits that a prudent vessel operator would maintain an active watch to ensure the safety and security of the crew, even while moored. Breathwit is of the opinion that more precautions that usual were warranted here where "the Sabine River is a narrow channel that can be prone to surging incidents by large, deep draft vessels,"[4] the SABINE's "'double bunked' mooring configuration [placed] additional dynamic stresses on the mooring lines when compared to a vessel moored to a static location like a dock," "smaller vessels [like the SABINE] are inherently more prone to surge incidents," and "a generator was actively running [on board the SABINE]." Tulloch's report states that the "SABINE remains a commercial vessel with a crew on board, and for the safety of those on-board, radio communications should be monitored, fire and flooding patrols should be maintained, the moorings checked periodically, and vessel traffic on the busy Sabine-Neches waterway monitored." The court concludes that KSS Line and Wolford have raised a genuine dispute of material fact as to whether, under the prevailing

---

[3] In fact, other cases have held that the duty to have a proper lookout may extend to an anchored vessel. *See The Clara*, 102 U.S. 200 (1880) (holding that anchored vessel was at fault for failing to keep a watch on deck); *Cliffs-Neddrill Turnkey Int'l-Oranjestad v. M/T Rich Duke*, 947 F.2d 83, 89 (3d Cir. 1991) ("The lookout requirement has been extended to anchored vessels.").

[4] KSS Line describes the "Sabine Neches Waterway" as "a narrow channel," and cites to *Punch v. M/V CAPTAIN KIRK*, No. 69-51, 1972 WL 327799, at *1 n.5 (E.D. La. 1971) ("The Sabine-Neches Canal, being a narrow channel within the provisions of the Inland Rules [of Navigation] . . . .").

circumstances and conditions, the SABINE had a duty to maintain an appropriate and effective watch at the time of allision and whether it breached that duty.

Further, KSS Line presents a National Transportation Safety Board's Port Arthur Vessel Traffic Service VHF Communications Recording to show that the GAS ARES and another vessel, the CHAD DOUGLAS, were in radio communication with each other nearly twenty minutes prior to the allision to make passing arrangements, and that approximately five minutes before the allision, the GAS ARES informed the CHAD DOUGLAS that the vessel was having a hard time maneuvering due to a flood.  KSS Line avers that had the SABINE maintained a proper watch by monitoring the radio channels, it would have been aware of the location of the GAS ARES and the navigational difficulties it was experiencing as the situation unfolded.  Breathwit opines that had the SABINE maintained a proper watch, Wolford "would have been able to take sufficient action to prevent harm to himself and the [SABINE] once it became clear an allision was imminent."  Tulloch similarly concludes, "It is thus highly probable that had a watch been maintained in the wheelhouse in accordance with the SABINE's SMS requirements, earlier action could have been taken to get the vessel underway or for the crew to secure and brace themselves properly for the collision."  Accordingly, KSS Line asserts that the SABINE could have taken action to avoid the allision by moving the tug or prevented injury to its crew by evacuating the tug. In light of the foregoing, the court finds that genuine issues of material fact exist as to causation in this case.

III.   Conclusion

Drawing all reasonable inferences in the light most favorable to KSS Line and Wolford, the court is of the opinion that questions of fact remain concerning the SABINE's duty to maintain an appropriate and effective watch at the time of allision, whether it breached that duty, and whether that breach resulted in the claimed injuries. Seabulk Petitioners have failed to established that no question of fact exists as to whether they are completely free from fault. Consequently, Seabulk Petitioners' Motion for Exoneration from Liability/Summary Judgment (#40) is DENIED.

SIGNED at Beaumont, Texas, this 17th day of September, 2024.

_____
MARCIA A. CRONE
UNITED STATES DISTRICT JUDGE